SKC

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

Barbara Johnson,

                Plaintiff,

v.

Phoenix, City of, et al.,

                Defendants.

No.  CV-24-02860-PHX-SPL (JZB)

**ORDER AND**

**ORDER TO SHOW CAUSE**

Plaintiff Barbara Johnson, on behalf of herself and as personal representative of the Estate of Cassidy Stigler, filed, through counsel, this civil rights action pursuant to 42 U.S.C. § 1983 and Arizona law.  (Doc. 1).  Defendants City of Phoenix ("City") and Phoenix Police Officer James Jarvis II (collectively, "City Defendants") and Maricopa County (the "County") and Maricopa County Sheriff Jerry Sheridan[1] (collectively, "County Defendants") have filed separate Motions to Dismiss for failure to state a claim pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.  (Docs. 9, 21).  Both Motions are fully briefed.  (Docs. 20, 22, 27, 30).

///

///

---

[1] In her Complaint, Plaintiff named former Maricopa County Sheriff Russell Skinner in both his official and individual capacities (Doc. 1-2 at 9−26 (Compl.) ¶ 14), but on January 6, 2025, Plaintiff filed a Notice of Automatic Substitution, and current Maricopa County Sheriff Jerry Sheridan was automatically substituted for Defendant Skinner in his official capacity.  (*See* Doc. 18).

The Court will grant City Defendants' Motion, grant in part and deny in part County Defendants' Motion, dismiss all federal claims, and order Plaintiff to show cause why this action should not be remanded to state court for lack of supplemental jurisdiction.

**I.    Plaintiff's Allegations**

**A.    Cassidy's Arrest and Detention**

On September 8, 2023, Phoenix Police officers arrested 22-year-old Cassidy Stigler pursuant to a misdemeanor warrant and suspected possession of narcotic drugs and drug paraphernalia.  (Doc. 1-2 at 13).  During the arrest, "Phoenix Police Officers alleged Cassidy resisted arrest and a violent altercation ensued," and Defendant Officer Jarvis "violently attacked Cassidy."  (*Id.*).  During the confrontation, "Cassidy's head struck the pavement multiple times."  (*Id.*).  At the time, Cassidy was 5'3" and weighed 100 pounds. (*Id.*).  After the officers subdued Cassidy, EMS treated her with Narcan, and Cassidy was taken to St. Joseph's Hospital due to a fentanyl overdose and other drugs in her system, and she remained there for approximately 9 hours.  (*Id.*).

Afterwards, Cassidy was released into Phoenix Police custody and booked into the Intake Transfer Release Jail (ITR).  (*Id.*).  At the ITR, Cassidy was designated a suicide risk and placed in a "safe cell" for around-the-clock monitoring.  (Doc. 1-2 at 13). According to Cassidy's Maricopa County Correctional Health Services (CHS) file, a suicide risk assessment was completed with the following notes:

> Pt seen cell side due to reports of wanting to hurt herself, pt reports that she 'just can't do it anymore' says that she is 'going crazy' in the cell, says that she wants to kill herself and 'has her ways' when asked how.  Pt says that she has attempted before by jumping off the 2nd tier while in custody.  Pt reports she is withdrawing from fentanyl, writer explains the SC process, pt understands.

(*Id.* at 15).

Cassidy was to have safe cell placement, hourly nurse check-ins, "MHP" follow ups, and continuous video monitoring.  (*Id.* at 14).  Under the heading "Education," Cassidy's CHS file contains the following notes:

Pt. is informed about the safe cell check procedure.

Patient encouraged to answer when their name is called and **keep face uncovered to prevent green blanket from being removed**.

Patient also encouraged to accept water when water is offered to promote adequate hydration.

(*Id.*).

The only video obtained from this incident is from 11:59:56 a.m. to 1:50:31 p.m. on September 9, 2024.  (*Id.*).  During this nearly 2-hour period, Cassidy is fully covered by the green blanket, including her face.  (*Id.*).  Throughout the entirety of the video, Cassidy never uncovers her face, as required by Maricopa County Sheriff's Office (MCSO)/CHS policies.  (Doc. 1-2 at 14).  From 11:59:56 until 12:27 p.m., Cassidy can be seen moving underneath the blanket, and at 12:27 p.m., she stops moving and remains still for the next 1 hour, 12 minutes.  (*Id.*).

During this time, the video shows the following:

- At 12:31 p.m., 12:34 p.m., 12:35 p.m., and 12:45 p.m., MCSO and CHS employees can be seen briefly viewing Cassidy through the window in the door of her cell.  (*Id.* at 15).

- At 12:53 p.m., employees saunter past Cassidy's cell without checking on her.  (*Id.* at 16).

- From 12:54 p.m. until 12:57 p.m., employees spend time with a detainee in the safe cell next to Cassidy's cell but ignore Cassidy's cell.  (*Id.*).

- At 1:00:28 p.m., an MCSO employee walks by Cassidy's cell, looks in for a couple of seconds, then moves on. (*Id.*).

- From 1:07 p.m. until 1:10 p.m., MCSO and CHS employees check a detainee's vitals in the cell next to Cassidy's cell.  (*Id.*).  That detainee is upright and responding to the employees and is then taken to another location.  (*Id.*).

- At 1:17:15, an MCSO employee looks into Cassidy's cell for 8 seconds then writes on her clipboard and moves on. (Doc. 1-2 at 16).

- At 1:20 p.m., an MCSO employee wanders down the hallway and checks on other cells but not Cassidy's cell. (*Id.*).

- At 1:27 p.m., an MCSO employee wanders down the hallway and briefly peeks into Cassidy's cell and moves on. (*Id.*).

- At 1:30 p.m., multiple MCSO and/or CHS employees walk down the hallway and do not look into Cassidy's cell. (*Id.*).

- At 1:32:14 p.m., an MCSO and a CHS employee come to Cassidy's door and open it. (*Id.*). While the CHS employee is attempting to talk to Cassidy, another employee walks by, and the employees talk and laugh about something. (*Id.*).

- At 1:33:23 p.m., after the employee trying to talk to Cassidy gets no response, the employee kicks the cell door multiple times. (Doc. 1-2 at 16.)

- At 1:33:48, the same employee picks up her stool[2] and walks away from Cassidy's cell. (*Id.* at 17). As she does so, she is smiling and says something to another employee and continues walking away. (*Id.*). For the next few minutes, until 1:37:57 p.m., no one approaches Cassidy's cell, but an MCSO employee can be seen yawning and wandering around. (*Id.*).

- At 1:37:57 p.m., an MCSO officer tries to talk to Cassidy and then retrieves multiple MCSO and CHS employees to come to Cassidy's cell. (*Id.*).

- For the next two minutes, the employees attempt to talk to Cassidy from outside the cell, and at 1:39 p.m., they open the cell door. (*Id.*).

---

[2] It is not clear from the facts presented if this employee sat down or why she had a stool.

- • At 1:39 p.m., MCSO and CHS employees enter Cassidy's cell and immediately roll Cassidy over, remove the green blanket, and begin CPR. (Doc. 1-2 at 14) Lifesaving attempts are, by then, ineffective; Cassidy was found dead, face down in her cell with visible injuries to her head, neck, and other areas of her body. (*Id.* at 17).

Based on post-mortem photos, it appears Cassidy suffered blunt force trauma to her forehead, jaw, and neck. (*Id.*). The medical examiner's report documented the following injuries:

- • Over the anterior right forehead is a crusted 3.0 x 0.8 cm brown abrasion.
- • Over the shoulders bilaterally are crusted brown abrasions up to 6.0 cm in greatest dimension.
- • Over the posterior neck are two rounded crusted brown wounds up to 0.6 cm in greatest dimension.
- • Over the left elbow is a crusted ovoid 2.0 cm abrasion.
- • Over the lateral right lower leg are a few irregular crusted brown abrasions over a 5.0 cm area.

(*Id.*).

## B. Deaths in County Custody

According to an article posted on August 5, 2024, a review by the Arizona Republic from 2019 to 2023 showed that Maricopa County had the highest rate of in-custody jail deaths of major jail systems in the country. (Doc. 1-2 at 18). The article stated that scholars who study in-custody death rates in U.S. jails found the numbers were incredibly high when compared to similarly sized jails and even jails with much larger populations. (*Id.*). The leading causes of death in Maricopa County jails are drug overdoses, drug withdrawals, and suicide. (*Id.*).

According to current and former MCSO administrations, understaffing has hindered operations and efforts to maintain safe conditions in the jails. (*Id.*). Former Sheriff Skinner stated that MCSO and CHS were taking proactive steps to address jail deaths, including by reviewing each incident involving attempted overdoses and attempted suicides, and through projects "involving training, scanners, prevention services through our tablet

program, and narcotic K9s in jail facilities," as well as by "working to enhance additional services through the use of medical monitoring technology." (*Id.*).

According to the August 2024 article, deaths in Maricopa County jails have "skyrocketed in recent years," even though the average daily population has decreased. (Doc. 1-2 at 19). In 2019, MCSO jails had an average daily population of 6,829 detainees, and there were 11 in-custody deaths that year. (*Id.*). In 2020, during the pandemic, the average daily jail population went down to 5,433; and in 2021, 2022, and 2023, the numbers steadily rose but remained below pre-pandemic levels. (*Id.*). In both 2022 and 2023, there were 43 in-custody jail deaths per year, compared to 11 in-custody jail deaths in 2019, a fourfold increase in three years. (*Id.*).[3] Cassidy's death, which occurred in September 2023, coincided with this uptick. (*Id.*).

The article quotes several scholars, including Andrea Armstrong, professor at Loyola University New Orleans College of Law, who stated, "I feel confident in saying the mortality rate in Maricopa County jails is astronomical." (*Id.*). Professor Armstrong also said the increase from 2019 to 2023 was concerning, and unlike a temporary "spike in deaths" that "comes back down," the numbers of in-custody deaths in Maricopa County "have been exponentially increasing each year." (Doc. 1-2 at 19).

Jay Aronson, a professor at Carnegie Mellon University, who co-authored a September 2023 book about U.S. deaths in custody also stated, "I can't tell you exactly what's going on [in the Maricopa County jails], but there are a hell of a lot of people dying."

_____

[3] Plaintiff alleges similar facts from the article comparing the national in-custody death rates per 100,000 detainees in 2019 (167) to the County in-custody death rate per 100,000 detainees in 2019 (161) and comparing the County in-custody death rate per 100,000 detainees in 2019 (161) to the County in-custody death rate per 100,000 detainees in 2022 (678), also showing a fourfold increase from 2019 to 2022, but based on extrapolated numbers per 100,000 detainees, not on the actual number of County detainees. (Doc. 1-2 at 19). Plaintiff does not allege what the national in-custody death rate was in 2022 from which to determine if or by how much it may have also increased over the same period. (*Id.*).

(*Id.* at 20).  Professor Aronson stated he would advise the County to review its policies for drug withdrawal and suicide prevention.  (*Id.*).  He opined that "[t]he raw number of deaths and the suicides are really, really high . . . and the mortality rate is significantly higher than the national average."  (*Id.*).

MCSO's and CHS' patterns, customs, and practices have led to this "astronomical rise in deaths," and these entities "knew and continue to know they have a problem with their patterns, customs, practices, and policies."  (*Id.*).

The County did not include in its reports of in-custody deaths the number of detainees who died in a hospital or who received a compassionate release because death was imminent.  (*Id.*).

**C.    Plaintiff's Claims**

In Count One, Plaintiff brings a § 1983 claim against Defendant Jarvis based on excessive use of force (Doc. 1-2 at 20); in Count Two, she brings negligence and gross negligence claims against the City, the County, and Defendant Sheridan in his official capacity (*id.* at 22);[4] and in Count III, she brings a § 1983 *Monell* claim against the County and Defendant Sheridan in his official capacity (*id.* at 24).

**II.    Motion to Dismiss Legal Standard**

Dismissal of a complaint, or any claim within it, for failure to state a claim under

---

[4] Although Plaintiff originally named former Maricopa County Sheriff Russell Skinner as a Defendant in both his individual and official capacities, she did not allege any facts showing Defendant Skinner personally violated Cassidy's rights, and in substance, her claims in Counts II and III are only against the Sheriff in his official capacity.  On January 6, 2025, after County Defendants filed their Motion to Dismiss, Plaintiff filed a Notice of Voluntary Dismissal Without Prejudice of Sheriff Russ Skinner from Count II (Doc. 19), notifying the Court she was voluntarily dismissing Defendant Skinner from Count II pursuant to Rule 41 of the Federal Rules of Civil Procedure, and Defendant Skinner was terminated from this action.  Although it was not clear from her Notice, based on her Response to County Defendants' Motion to Dismiss, Plaintiff voluntarily dismissed all claims (whether individual or official capacity) against the Sheriff (whether named as Skinner or Sheridan) in Count II to investigate a possible notice of claim issue.  (*See* Doc. 20 at 7−8).  Thus, the only remaining claims against County Defendants in Count II at this juncture are Plaintiff's negligence/gross negligence claims against the County.

Federal Rule of Civil Procedure 12(b)(6) may be based on either a "'lack of a cognizable legal theory' or 'the absence of sufficient facts alleged under a cognizable legal theory.'" *Johnson v. Riverside Healthcare Sys., LP*, 534 F.3d 1116, 1121–22 (9th Cir. 2008) (quoting *Balistreri v. Pacifica Police Dep't,* 901 F.2d 696, 699 (9th Cir. 1990)).   In determining whether a complaint states a claim under this standard, the allegations in the complaint are taken as true and the pleadings are construed in the light most favorable to the nonmovant. *Outdoor Media Group, Inc. v. City of Beaumont*, 506 F.3d 895, 900 (9th Cir. 2007).   A pleading must contain "a short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).   To survive a motion to dismiss, a complaint must state a claim that is "plausible on its face."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *see Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007).   "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Iqbal*, 556 U.S. at 678.

### III.        City Defendants' Motion to Dismiss

#### A.        Count I: Excessive Use of Force (§ 1983)

To state a claim under § 1983, a plaintiff must allege facts showing that (1) acts by the defendants (2) under color of state law (3) deprived her of federal rights, privileges or immunities and (4) caused her damage.  *Thornton v. City of St. Helens*, 425 F.3d 1158, 1163-64 (9th Cir. 2005) (quoting *Shoshone-Bannock Tribes v. Idaho Fish & Game Comm'n*, 42 F.3d 1278, 1284 (9th Cir. 1994)).  In addition, a plaintiff must allege that she suffered a specific injury as a result of the conduct of a particular defendant and she must allege an affirmative link between the injury and the conduct of that defendant.  *Rizzo v. Goode*, 423 U.S. 362, 371–72, 377 (1976).

The use of excessive force by police officers during an arrest can violate an arrestee's Fourth Amendment right to be free from unreasonable seizures.  *See White by White v. Pierce County*, 797 F.2d 812, 816 (9th Cir. 1986).  The Fourth Amendment does not prohibit the use of reasonable force.  *Tatum v. City & County of S.F.*, 441 F.3d 1090,

1095 (9th Cir. 2006). Force is excessive if the officers' use of force was "objectively unreasonable" in light of the facts and circumstances confronting them, without regard to their mental state. *Kingsley*, 576 U.S. at 396; *see also Graham v. Connor*, 490 U.S. 386, 397 (1989) (applying objective standard to a Fourth Amendment excessive force claim arising during an investigatory stop).

Because officers are often forced to make split-second decisions in rapidly evolving situations, the reasonableness of a particular use of force must be made "from the perspective of a reasonable officer on the scene, including what the officer knew at the time, not with the 20/20 vision of hindsight." *Id.* at 2473–74 (citing *Graham*, 490 U.S. at 396). Further, "[n]ot every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers," violates the Constitution. *Graham*, 490 U.S. at 396 (citation omitted). Ultimately, [courts] must balance the force that was used by the officers against the need for such force to determine whether the force used was "greater than is reasonable under the circumstances." *Espinosa v. City & Cnty. of S.F.*, 598 F.3d 528, 537 (9th Cir. 2010).

Plaintiff alleges that, during Cassidy's arrest, "a violent confrontation ensued," and she alleges in conclusory fashion that Defendant Jarvis "violently attacked Cassidy." (Doc. 1-2 at 13). She also alleges that, "[d]uring that confrontation, Cassidy's head struck the pavement multiple times," and that Cassidy's later-documented injuries suggest that "Cassidy suffered blunt force trauma to her forehead and jaw, as well as injuries to her neck." (*Id.* at 13, 17).

Plaintiff does not, however, allege any nonconclusory facts about what happened during the arrest or during Defendant Jarvis' alleged "violent attack" to show the nature of force used or any facts about Cassidy's actions during the encounter to show if she was resisting arrest or engaging in actions that required the use of force. It is also unclear on the facts alleged what caused Cassidy's head to hit the pavement or what Defendant Jarvis or any other officers on the scene were doing at that time.

Plaintiff alleges that it is "inconceivable" that Cassidy, who "was 5'3" and only 100

lbs.," posed a threat to the officers or resisted arrest "to warrant her injuries." (*Id.* at 13). But absent any facts about what occurred to cause those injuries, it is impossible to attribute them to any actions of Defendant Jarvis or any other officers. Even though "[t]he standard used to evaluate a motion to dismiss is a liberal one," the Court "may not supply essential elements of the claim that were not initially pled. Vague and conclusory allegations of official participation in civil rights violations are not sufficient to withstand a motion to dismiss." *Ivey v. Bd. of Regents of Univ. of Alaska*, 673 F.2d 266, 268 (9th Cir. 1982). The Court will dismiss Plaintiff's Fourth Amendment claim against Defendant Jarvis without prejudice for failure to state a claim.

### B.     Count II: Negligence/Gross Negligence against the City

Plaintiff's negligence and gross negligence claims against the City are based on the City's vicarious liability for the alleged violations of its employees, here Defendant Jarvis. (Doc. 1-2 at 11, 22). "Under the doctrine of respondeat superior, an employer can be vicariously liable for the negligence of an employee if the employee is under the control of the employer at the time an accident occurs." *Sanchez v. Maricopa Cnty.*, No. CV-24-0013-PR, 2025 WL 2025888, at *1 (Ariz. July 21, 2025) (citing *Engler v. Gulf Interstate Eng'g, Inc.*, 280 P.3d 599, 601 (Ariz. 2012) ("the Deputy was carrying out law enforcement duties under the control of the Sheriff at the time of the accident, rendering the Sheriff vicariously liable for the Deputy's negligence")).

To establish negligence under Arizona law, a plaintiff must show four elements: "(1) a duty requiring the defendant to conform to a certain standard of care; (2) a breach by the defendant of that standard; (3) a causal connection between the defendant's conduct and the resulting injury; and (4) actual damages." *Gipson v. Kasey*, 150 P.3d 228, 230 (Ariz. 2007) (internal citations omitted). "To be grossly negligent, the actor's conduct must create an unreasonable risk of physical harm to another, and such risk must be substantially greater than the risk involved in ordinary negligence." *Rourk v. State*, 821 P.2d 273, 280 (Ariz. Ct. App. 1991) (citing *Kemp v. Pinal Cnty.*, 474 P.2d 840, 843 (1970) (quoting Restatement (Second) of Torts § 500)). As compared to simple negligence, gross

negligence "is flagrant and evinces a lawless and destructive spirit." *Walls v. Arizona Dep't of Pub. Safety*, 826 P.2d 1217, 1221 (Ariz. Ct. App. 1991) (quoting *Scott v. Scott*, 252 P.2d 571, 575 (Ariz. 1953)).

Plaintiff alleges that Defendant Jarvis had a duty at the time of Cassidy's arrest to assess whether "de-escalation techniques should be used versus excessive force by Jarvis," and he breached that duty by failing to employ techniques that did not involve "a violent physical confrontation with Cassidy." (Doc. 1-2 at 22). Plaintiff alleges that "Cassidy was sitting and talking with Jarvis," so that, "multiple other options were available to Jarvis – including calling for backup, peacefully discussing the situation, and using all available de-escalation techniques to initiate and finalize a peaceful arrest." (*Id.*).

City Defendants argue that Plaintiff fails to state a claim for multiple reasons, including that the City cannot be held liable under Arizona law for its employees' intentional acts or for their simple negligence, and Plaintiff fails to state a gross negligence claim. (Doc. 21 at 7−10.) They note, "there are no factual allegations in the Complaint regarding what specific actions Officer Jarvis allegedly took other than being involved in a 'violent confrontation,'" and they argue, "[t]his is insufficient detail" to demonstrate the requisite state of mind for gross negligence. (*Id.* at 10.)

Even with the additional factual allegation that Cassidy was, at some unidentified time, seated and "talking with Jarvis," Plaintiff fails to allege sufficient facts about what transpired over the course of Cassidy's arrest—such as what preceded the alleged use of force or what, specifically, either Cassidy or Defendant Jarvis were doing at the time—to state a claim that Defendant Jarvis negligently failed to employ de-escalation techniques or that his conduct rose to the level of gross negligence. There are simply no facts from which to infer what, if any, de-escalation techniques Defendant Jarvis could have used under the circumstances but negligently failed to employ.

Because Plaintiff's allegations are factually insufficient to state either a simple negligence claim or to meet the higher threshold for alleging gross negligence, the Court need not address City Defendants' other arguments for dismissing Plaintiff's

negligence/gross negligence claims against the City.  The Court will dismiss these claims and the City without prejudice for failure to state a claim.

## IV.     County Defendants' Motion to Dismiss

### A.     Count II: Negligence and Gross Negligence Against the County

Plaintiff sues the County based on vicarious liability for the alleged negligence and gross negligence of CHS employees.  (Doc. 1-2 at 11).  Plaintiff alleges that these employees collectively "had a duty to assure the safety and well-being of Cassidy while in their care, custody and control," which included "providing proper, appropriate and timely medical care to Cassidy."  (*Id.* at 22).  Plaintiff also alleges that, based on their alleged actions and inactions in the Complaint, these employees "breached that duty systematically and repeatedly, . . . resulting in the Jail being operated in a manner such that [it] presented a grave and imminent danger to Cassidy."  (*Id.*).

The County argues that Plaintiff fails to state a negligence or gross negligence claim based on the alleged actions of CHS employees for several reasons, including that negligence does not encompass intentional acts, and Plaintiff merely alleges intentional conduct on the parts of CHS staff; public officials have qualified immunity for discretionary acts within the scope of their public duties that constitute simple negligence; and Plaintiff fails to allege sufficient facts to show gross negligence. (Doc. 9 at 7−11).

#### 1.     Intentional Acts

The County argues that, in Arizona, intentional actions, "like the ones alleged here," cannot serve as the bases of a negligence claim.  (Doc. 9 at 7).  *Ryan v. Napier*, on which the County relies, held that a plaintiff bringing an excessive-use-of-force claim "cannot assert a negligence claim based solely on an officer's intentional use of physical force," for which the appropriate tort is battery, but a plaintiff can base a negligence claim "on conduct by the officer that is independent of the intentional use of physical force."  425 P.3d 230, 233 (Ariz. 2018).  The Arizona Supreme Court did not, however, address alleged negligence in the context of medical monitoring, as is at issue here.  It is also clear from the context of *Napier* and the other, out-of-state cases on which the County relies that the

standard articulated in *Napier* does not broadly exclude from the ambit of negligence any claims involving some degree of intentional *conduct*, as the County appears to suggest. Instead, it excludes from the ambit of negligence only alleged actions that constitute an intentional *tort*, meaning those requiring an "intent to inflict harmful or offensive contact." 425 P.3d at 237.[5]

The County does not argue, nor can it, that Plaintiff alleges facts showing CHS employees intended to harm Cassidy.  Although the facts alleged broadly include intentional conduct, such as walking down hallways, looking into Cassidy's cell, and allegedly "willfully participating in a practice or custom that denied Cassidy adequate monitoring," these actions, while they may suggest inattentiveness and a lack of due care, do not evince an intent to harm.  Moreover, Plaintiff's negligence claims are based not on the alleged intentional acts of these employees, but on their alleged failures to act, including their failures over a more than one hour period, while Cassidy lay motionless and fully covered by a blanket, to lift the blanket or to engage in any verbal contact with Cassidy, despite Cassidy being placed in a "safe cell" for around-the-clock monitoring and being subject to a "cell check procedure" that required her to keep her head uncovered.  The County' reliance on *Napier* for the proposition that such conduct can only be construed as an intentional tort and therefore cannot serve as the basis of a negligence or gross negligence claim is misplaced and is not a ground for dismissing Plaintiff's negligence and gross negligence claims against the County.

### 2.    Qualified Immunity for Discretionary Acts

The County also argues that Plaintiff's simple negligence claims must be dismissed because, in Arizona, qualified immunity shields government officials from liability for discretionary acts unless the conduct alleged is grossly negligent or reckless.  (Doc. 9 at 9).

"As a general rule, [in Arizona,] public entities and public employees are subject to

---

[5] The County's reliance on out-of-state cases (*see* Doc. 8 at 7) is additionally inapplicable here because those cases, even if analogous, are based on Michigan and District of Columbia law, not Arizona law.

tort liability for their negligence." *Spooner v. City of Phoenix*, 435 P.3d 462, 466 (Ariz. Ct. App. 2018); *see also Glazer v. State*, 321 P.3d 470, 476 (Ariz. Ct. App. 2014), *vacated in part on other grounds,* 347 P.3d 1141 (2015) (Under Arizona common law, "the government is liable for its tortious conduct and immunity is the exception.") (internal quotation marks and citation omitted). Nonetheless, "qualified immunity protects government officials from liability for acts within the scope of their public duties unless the official knew or should have known that he was acting in violation of established law or acted in reckless disregard of whether his activities would deprive another person of their right." *Chamberlain v. Mathis*, 729 P.2d 905, 912 (Ariz. 1986). Thus, "a public official performing a discretionary act encompassed within her public duties is shielded from liability for simple negligence." *Spooner*, 435 P.3d at 467. "If immunity applies, an officer is shielded from liability unless the conduct rises to gross negligence or recklessness." *Jennings v. Agne in & for Cnty. of Maricopa*, 520 P.3d 665, 669 (Ariz. Ct. App. 2022) (citing *Spooner*, 435 P.3d at 467)). "A public official's conscious disregard of the law or the rights of others constitutes gross negligence." *Id.*

The County argues that it is entitled to qualified immunity based on the discretionary nature of its employees' actions during Cassidy's ITR confinement because, even though "[t]he act of making rounds to check on inmates may be related to a policy, . . . the decisions made by . . . CHS staff in responding to events of that day or determining, generally, how an inmate acknowledges the employee during checks, inherently required judgement and discretion." (Doc. 9 at 10). They also argue that the facts alleged in the Complaint do not show that these employees "knew or should have known they were acting in violation of established law or acted in reckless disregard of whether their activities would deprive another person of their rights." (*Id.*).

In support of these arguments, the County relies on the allegations showing staff "checked [on]" Cassidy eleven times between 12:31 p.m. and 1:39 p.m., which they argue is "much more often than the required one-hour checks." (*Id.*). And, without acknowledging Plaintiff's other allegations, including that, from 12:27 p.m. on, Cassidy

was motionless and uncommunicative, with her body and face completely covered by a blanket, the County incongruously argues that "the sheer number of times [Cassidy] was checked on by staff shows [staff] were more than diligent in their efforts to perform their duties." (*Id.* at 11). For these reasons, the County argues that, even if some of the checks were done negligently, "Plaintiff does not meet the higher standard required for showing gross negligence[,] and this cause of action should be dismissed." (*Id.*).

These arguments fail for several reasons. First, the County overlooks or misstates many of the facts alleged, including the facts concerning applicable monitoring requirements. The County seizes on Plaintiff's allegation that Cassidy was to have hourly "nurse checkups" to argue that CHS staff "went above and beyond the required one-hour check, often checking on [Cassidy] within minutes of the last check." (*Id.* at 10−11). Based on the facts alleged, however, none of the eleven "checks" staff made on Cassidy between 12:27 pm—when Cassidy stopped moving—and 1:39 p.m.—when she was found dead— were "nurse checkups." Construing the facts in Plaintiff's favor, as the Court must, a "nurse checkup" requires some degree of medical monitoring, which did not occur on an hourly basis, nor at any time during Plaintiff's custody at the ITR until nearly two hours had elapsed, by which time Cassidy had already passed away and could not be revived. (Doc. 1-2 at 14, 17).

Hourly nurse checkups were also not the only alleged monitoring requirements. Under the facts alleged, CHS staff determined that Cassidy's condition required continuous video monitoring and performing a cell check procedure. (*Id.* at 5). The notes about the alleged cell check procedure in Cassidy's CHS file support the inference that, during cell checks, such as those captured on the video, staff were required to call out a patient's name to elicit a verbal response, and if the patient did not respond and her head was entirely covered by her blanket—as was the case here—they were required to remove the blanket. Even if the frequency and manner in with which staff carried out these procedures involved some degree of discretion, the written statements in Cassidy's medical records suggest that the obligation to perform such tasks during cell checks was not, itself, discretionary. It is

also plausible to infer that all the employees who stopped outside Cassidy's door and either looked through the window, tried to get Cassidy's attention, and/or jotted down notes on a clipboard were responsible for performing cell checks and were therefore required to perform these tasks. (*See id.* at 15–17). Yet, the allegations show that none of the employees who looked into Cassidy's cell during the one hour and twelve minutes Cassidy remained motionless and completely covered by a blanket made any attempt to do so. Under these facts, qualified immunity for discretionary acts does not apply, and the County is not shielded from liability for simple negligence.

Additionally, drawing all plausible inferences in Plaintiff's favor, if CHS employees had conducted proper cell checks, Cassidy may have been revived before it was too late, and her death could have been prevented. Accordingly, Plaintiff alleges sufficient facts to show that CHS employees had a duty to conform to a certain standard of care, they breached that duty, and their breach caused Cassidy harm. Plaintiff therefore adequately states a simple negligence claim, *see Gipson*, 150 P.3d at 230, and under the facts alleged, the County is not shielded from vicarious liability as to this claim.

### 3.    Gross Negligence

Plaintiff also alleges sufficient facts to state a gross negligence claim, for which the County does not dispute it may be held vicariously liable.

As discussed, the allegations that individual MCSO and CHS employees looked through the window into Cassidy's cell at various intervals are sufficient to infer that these individuals were tasked with monitoring Cassidy's condition. It is also clear on the facts alleged that, for more than one hour, while Cassidy remained motionless and completely covered by a blanket, no employee made any reasonable attempt to ascertain Cassidy's condition or check on her welfare. Although a CHS employee at one point attempted to talk to Cassidy and kicked the door to Cassidy's cell several times in an apparent attempt to get Cassidy's attention, this employee also moved on without getting a response or doing anything to investigate Cassidy's failure to respond. (Doc. 1-2 at 15–17).

Construing the facts in Plaintiff's favor, these employees knew or had reason to

know Cassidy was admitted to the ITR following a drug overdose, was on suicide watch, and required continuous monitoring, including through cell checks that required calling out her name and removing the blanket from her face, if covered.  These employees also knew or should have known that failing to ascertain Cassidy's condition under these circumstances created "an unreasonable risk of physical harm" to Cassidy.  *Rourk*, 821 P.2d at 280.  While "there is no fixed rule for . . . what constitutes gross negligence," Arizona courts have defined "wanton or gross negligence" as "the creation of an unreasonable risk of bodily harm to another[,] together with a high degree of probability that substantial harm will result.  *Kemp v. Pinal Cnty.*, 124, 474 P.2d 840, 843 (Ariz. App. 1970) (citing *Bryan v. Southern Pacific Company*, 79 Ariz. 253, 286 P.2d 761 (Ariz. 1955)); *see also Nichols v. Baker*, 416 P.2d 584, 586 (Ariz. 1966) (describing "wanton negligence" as a defendant's willful acts or failures to act while knowing or having reason to know of facts that would lead a "reasonable" person to realize such conduct "not only creates an unreasonable risk of bodily harm . . . but also involves a high degree of probability that substantial harm will result").  Construing the facts in a light most favorable to Plaintiff, this threshold is met under the facts alleged here, and Plaintiff sufficiently states a gross negligence claim.

The Court will deny County Defendants' Motion to Dismiss Plaintiff's negligence and gross negligence claims against the County based on vicarious liability in Count II.

**B.    Count III: *Monell* Claims Against County Defendants (§ 1983)**

In Count Three, Plaintiff asserts Fourteenth Amendment[6] claims against the County and Defendant Sheridan in his official capacity based on the County's and MCSO's alleged custom and practice of failing to prevent deaths in custody of detainees battling drug overdoses, withdrawals, and suicidal actions.

---

[6] Plaintiff identifies these claims as arising under both the Eighth Amendment and the Fourteenth Amendment.  (Doc. 1-2 at 24).  Because Cassidy was a pre-trial detainee at the time of this action, these claims are properly analyzed under the Fourteenth Amendment.  *See Kingsley v. Hendrickson*, 576 U.S. 389, 397 (2015); *Gibson v. Cnty. of Washoe*, 290 F.3d 1175, 1197 (9th Cir. 2002).

1    "Pretrial detainees are entitled to 'adequate food, clothing, shelter, sanitation,
2    medical care, and personal safety.'" *Alvarez-Machain v. United States*, 107 F.3d 696, 701
3    (9th Cir. 1996) (quoting *Hoptowit v. Ray*, 682 F.2d 1237, 1246 (9th Cir. 1982)).  The Ninth
4    Circuit Court of Appeals has held that "claims for violations of the right to adequate
5    medical care 'brought by pretrial detainees against individual defendants under the
6    Fourteenth Amendment' must be evaluated under an objective deliberate indifference
7    standard." *Gordon v. Cnty. of Orange*, 888 F.3d 1118, 1124−25 (9th Cir. 2018) (quoting
8    *Castro v. Cnty. of Los Angeles*, 833 F.3d 1060, 1070 (9th Cir. 2016)).

9    To show a deprivation of her Fourteenth Amendment right to receive reasonable
10   medical care, a plaintiff must show that defendants were objectively deliberately
11   indifferent to that right. *Gordon*, 888 F.3d at 1124−25.  Unlike in the Eighth Amendment
12   context, where a showing of subjective deliberate indifference is required, a plaintiff need
13   not show subjective intent on the part of medical providers to establish a constitutional
14   violation. *Id.* at 1125.  Instead, it is sufficient to show that an official made a deliberate
15   choice with respect to the plaintiff s medical care that put the plaintiff at "substantial risk
16   of serious harm" and did not take "reasonable available measures" to abate a risk of serious
17   harm, "even though a reasonable official in the same circumstances would have appreciated
18   the high degree of risk involved—making the consequences of the defendant' s conduct
19   obvious." *Id.*

20   Local government entities are considered "person[s] acting under color of state law"
21   who can be sued under § 1983. *Monell,* 436 U.S. at 690.  However, there is no respondeat
22   superior liability under § 1983, so to maintain a claim against the County or Defendant
23   Sheridan in his official capacity, Plaintiff must meet the test articulated in *Monell v.*
24   *Department of Social Services of City of New York*, 436 U.S. 658, 690−94 (1978).
25   Accordingly, County Defendants may only be held liable under § 1983 for their
26   employees' civil rights deprivations if Plaintiff can show that an official policy or custom
27   caused the constitutional violation. *Monell*, 436 U.S. at 694.

28   To make this showing, Plaintiff must demonstrate that (1) Cassidy was deprived of

a constitutional right; (2)  County Defendants had a policy or custom; (3) the policy or custom amounted to deliberate indifference to Cassidy's constitutional right; and (4) the policy or custom was the moving force behind the constitutional violation.  *Mabe v. San Bernardino Cnty., Dep't of Pub. Soc. Servs.*, 237 F.3d 1101, 1110−11 (9th Cir. 2001). Further, if the policy or custom in question is an unwritten one, Plaintiffs must show that it is so "persistent and widespread" that it constitutes a "permanent and well settled" practice.  *Monell*, 436 U.S. at 691 (quoting *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 167-68 (1970)).  "Liability for improper custom may not be predicated on isolated or sporadic incidents; it must be founded upon practices of sufficient duration, frequency and consistency that the conduct has become a traditional method of carrying out policy." *Trevino v. Gates*, 99 F.3d 911, 918 (9th Cir. 1996); *Connick v. Thompson*, 563 U.S. 51, 61 (2011) ("Official municipal policy includes the decisions of a government's lawmakers, the acts of its policymaking officials, and practices so persistent and widespread as to practically have the force of law.").

County Defendants argue that Plaintiff fails to state a *Monell* claim because she does not allege with any specificity what policies or practices caused Cassidy's death and only baldly alleges that "[t]he pattens, customs, and practices employed in Maricopa and MCSO jail and jail health environments are such that present a substantial risk of serious harm to all inmates who are battling drug overdoses, withdrawals, and suicidal actions."  (Doc. 9 at 4−5 (quoting Doc. 1-2 at 24)).  County Defendants argue that Plaintiff has neither identified the policy or widespread custom at issue nor alleged any facts showing a pattern of similar constitutional violations.  (*Id.* at 5−6).[7]

---

[7] County Defendants also argue, relying on a summary judgment standard, that the contents of the newspaper article Plaintiff relies on to support the high rate of deaths in County custody are hearsay and inadmissible to establish the facts asserted therein, and "Plaintiff's efforts to [establish] a custom policy issue by citing to hearsay evidence is insufficient."  (Doc. 9 at 5−6 (citing *Ahern v. Kammerer*, No. 3:21-CV-00561-YY, 2024 WL 4368276, at *4 (D. Or. Sept. 3, 2024), *report and recommendation adopted sub nom. Ahren v. Kammerer*, No. 3:21-CV-561-YY, 2024 WL 4368226 (D. Or. Oct. 1, 2024))). These arguments do not apply at the pleading stage, where the allegations in the complaint

1   Apart from alleging sufficient facts from which to infer that MCSO and CHS staff
2   were required to perform discrete, non-discretionary acts to monitor Cassidy while she was
3   on suicide watch, Plaintiff has not alleged any facts from which to infer a specific, written
4   policy of County Defendants or to show that any such policy was both deliberately
5   indifferent and the cause of Cassidy's death.  Accordingly, whether Plaintiff states a *Monell*
6   claim depends on whether she alleges sufficient facts from which to infer a deliberately
7   indifferent pattern or practice that was "so persistent and widespread as to practically have
8   the force of law," *Connick*, 563 U.S. at 6, and was, additionally, the "moving force" behind
9   Cassidy's death. *Mabe*, 237 F.3d at 1110−11.

10   Relevant to this showing, Plaintiff generally alleges that Maricopa County jails are
11   understaffed and that, according to current and former MCSO administrations,
12   understaffing "has hindered operations and challenged efforts to maintain safe conditions."
13   (Doc. 1-2 at 18).  But even if these allegations are sufficient to infer County Defendants
14   have a regular pattern or practice of understaffing county jails that is deliberately
15   indifferent to the rights of jail detainees, Plaintiff does not allege any facts plausibly
16   connecting understaffing to Cassidy's death.  Moreover, based on the facts alleged, staff
17   regularly looked into Cassidy's cell, sometimes only minutes apart, during the one hour,
18   12-minute timeframe they allegedly failed to notice she was motionless and completely
19   covered, while additional staff tended to other detainees or aimlessly walked the corridor.
20   Inferring from Plaintiff's allegations that understaffing is a problem in Maricopa County
21   jails, generally, these facts do not show that the ITR was understaffed at the time of
22   Cassidy's death or that lack of available personnel was the "moving force" behind
23   Cassidy's injuries.  To the contrary, the allegations support that staff were available to
24   properly monitor Cassidy's condition, but their alleged failures to do so—not a shortage of
25   personnel—was the moving force behind Cassidy's death.

26   Plaintiff has also failed to allege sufficient facts to show that these failures to

27

28   are taken as true, and the pleadings are construed in the light most favorable to the
nonmovant. *Outdoor Media Group*, 506 F.3d at 900.

properly monitor Cassidy's condition, even if sufficient to state a constitutional violation, were indicative of a pattern or practice that was so "persistent and widespread" that it constitutes a "permanent and well settled" practice of County Defendants. *Monell*, 436 U.S. at 691. As discussed, Plaintiff's allegations show that MCSO and CHS staff peeked into Cassidy's safe cell eleven times when Cassidy was motionless and fully covered by a blanket, and they consistently failed to call her name, converse with her, or uncover her face, despite Plaintiff's other allegations plausibly showing they were required to do so. It is unclear from the facts alleged, however, whether this conduct involved multiple different staff or merely a small cadre of the same two to three individuals or how many MCSO and CHS staff, respectively, were responsible for but failed to adequately ascertain Cassidy's condition. *See Henry v. Cnty. of Shasta*, 132 F.3d 512, 521 (9th Cir. 1997) (finding a policy more likely where multiple employees were involved in the constitutional violation). Even inferring in Plaintiff's favor that all staff who looked into Cassidy's cell for the one hour and 12 minutes Cassidy lie motionless and completely covered failed to take reasonable available measures to avert a substantial threat of serious harm to Cassidy, the facts alleged are too vague regarding how many MCSO or CHS staff were involved in Cassidy's care over this relatively short period of time to infer that their conduct was "so persistent and widespread as to practically have the force of law." *Connick*, 563 U.S. at 6.

Plaintiff argues that the additional facts alleged from the Arizona Republic article are enough to make this showing. (Doc. 20 at 4). These allegations establish, as a factual matter: (1) the death rate of jail detainees in Maricopa County custody quadrupled from 11 in 2019 to 43 in both 2022 and 2023; (2) Maricopa County has the highest rate of in-custody jail deaths of similarly sized major jail systems in the country, and (3) the leading causes of death in Maricopa County jails are drug overdoses, drug withdrawals, and suicide. (Doc. 1-2 at 19).

Merely alleging that a spike in deaths, primarily involving drug overdoses, withdrawals, and suicides, occurred in county jails during the same time as Cassidy's death, without alleging any facts showing these deaths were attributable to inadequate medical

monitoring, such is at issue here, is also not enough to attribute these deaths to any identifiable deliberately indifferent policies or practices of Defendants or to link those policies and practices to the alleged constitutional violations in Cassidy's case. Plaintiff's allegation that the County's "patterns, customs, and practices have led to this 'astronomical' rise in deaths" is also vague and conclusory and inadequate to infer any identifiable policies or practices of County Defendants that led to this rise in deaths or—more fundamentally—to relate any such purported policies and practices to Cassidy's death due to improper medical monitoring.

Plaintiff's allegations that former Sheriff Skinner said his office was taking proactive steps—including implementing projects involving training, scanners, narcotic K9s, and medical monitoring technology—to address the high number of deaths in county jails are also insufficient to show that MCSO or the County had a deliberately indifferent policy or practice at the time of this action that was the moving force behind Cassidy's death. Plaintiff argues that Skinner's statement, "necessarily implies that the previous policies, practices, or customs were deficient and were contributing to that astronomical death rate." (Doc. 20 at 5). But while Skinner's alleged statement supports that MCSO personnel were aware of rising in-custody death rates and the need to take steps to address this issue, these statements, like Plaintiff's other allegations about the increased and "astronomical" level of in-custody deaths in Maricopa County, are merely stated at a high level of generality. Plaintiff does not allege any facts showing that any of the past deaths, including those that were drug or suicide-related, occurred under similar circumstances to those presented here or even occurred in a medical unit and involved improper monitoring.

Plaintiff argues that, to state a *Monell* claim, she does not have to "specifically recite the details of an allegedly deficient policy," but must only allege sufficient facts from which to infer the existence of that policy. (Doc. 20 at 3 (citing *Stuart*, No. CV-21-01917-PHX-DJH, 2024 WL 4708059, at *5)). She relies, in part, on *Barrett v. Maricopa Cnty. Sheriff's Off.*, No. CV-08-2095-PHX-GMS-MHB, 2010 WL 46786, at *7 (D. Ariz. Jan. 4, 2010), in which the District Court stated, "[t]he Ninth Circuit has held that plaintiffs need

1    not specifically allege a custom or policy; it is enough if the custom or policy can be

2    inferred from the allegations of the complaint."  (Doc. 20 at 3).

3            But in *Barrett*, the court found the plaintiff alleged sufficient instances of a

4    particular kind of conduct—in that case, CHS's alleged failures to adequately track and

5    administer prescription medications—to establish a regular pattern or practice of that

6    particular deficiency.  *Id.* at *7−8.  *Shaw v. State of California Department of Alcoholic*

7    *Beverage Control,* 788 F.2d 600, 610 (9th Cir.1986), on which *Barrett* relied for the

8    proposition that "the custom or policy can be inferred from the allegations of the

9    complaint," similarly found that the plaintiff alleged sufficient racially discriminatory

10    actions by police over a four-year period to show "a pattern or a series of incidents" of the

11    same or similar conduct from which a racially discriminatory policy or custom could be

12    inferred.  *Barrett*, 2010 WL 46786, at *7 (citing *Shaw*, 788 F. 2d at 610)).

13            Plaintiff's reliance on these cases to show that a deficient custom or practice can be

14    inferred from the facts alleged here is misplaced.  Unlike in *Barrett* and *Shaw*, Plaintiff

15    fails to allege any other instances of similar conduct to the alleged conduct of MCSO and

16    CHS employees from which to infer a policy or custom.  To the extent there is a correlation

17    between Cassidy's death and the alleged spike in detainee deaths in County custody during

18    the same time, Plaintiff fails to allege any facts from which to infer what the correlation is,

19    which is insufficient to state a *Monell* claim.  In short, Plaintiff attempts to translate a

20    dramatic increase in in-custody deaths in Maricopa County to unidentified policies and

21    practices of County Defendants without alleging any facts about what these policies and

22    practices are.

23            Even if it is plausible to infer from the facts alleged that some as-yet unidentified

24    policies or practices of County Defendants are to blame for the County's anomalous in-

25    custody death rate, Plaintiff's allegations are insufficient to place County Defendants on

26    notice regarding what these alleged policies and practices are or to show a connection

27    between them and what allegedly occurred in this action.  *See, e.g., A.E. ex rel. Hernandez*

28    *v. City of Tulare*, 666 F.3d 631, 637 (9th Cir. 2012) (a complaint "must contain sufficient

allegations of underlying facts to give fair notice and to enable the opposing party to defend itself effectively . . . This standard applies to *Monell* claims" ) (citations omitted); *see also Stuart v. City of Scottsdale*, No. CV-21-01917-PHX-DJH, 2024 WL 4708059, at *5 (D. Ariz. Nov. 7, 2024) ("It is well-established in the Ninth Circuit that a plaintiff asserting a *Monell* claim must allege *facts* that would support the existence of the alleged policy, practice, or custom") (emphasis in original).

Plaintiff also argues, based on the allegation that the County did not include any deaths that occurred in a hospital or after compassionate release in "their reported numbers," that the County "hid multiple deaths." (Doc. 20 at 5; Doc. 1-2 at 20). Absent any facts about the context of the County's "reported numbers" or their purpose, however, these allegations are too vague to show the County "hid" any deaths. In any event, such a showing would not bolster Plaintiff's *Monell* claim because Plaintiff does not allege any causal link between the County's alleged deceptive reporting practices and Cassidy's death, nor is it plausible to infer that a purported lack of proper reporting had anything to do with the improper medical monitoring at issue here.

To the extent Plaintiff relies on these allegations merely to show that the actual number of deaths attributable to the County is even higher than the numbers stated in the Arizona Republic article, these allegations, taken as true, are still inadequate to state a *Monell* claim because they still say nothing about the reasons for these deaths and are too vague to infer any identifiable deliberately indifferent policies or practices that caused these deaths or to show a causal relationship between any such policies/practices and Cassidy's death. *See Dougherty v. City of Covina*, 654 F.3d 892, 900−901 (9th Cir. 2011) (holding that the district court properly dismissed a § 1983 claim against the City because the complaint did not contain "any facts demonstrating that [the alleged] constitutional deprivation was the result of a policy, custom or practice of the City of Covina or that the custom or practice was the 'moving force' behind his constitutional deprivation").

The Court will dismiss Plaintiff's *Monell* claim against County Defendants in Count III without prejudice for failure to state a claim.

**IT IS ORDERED:**

(1)     The reference to the Magistrate Judge is **withdrawn** as to City Defendants' and County Defendants' Motions to Dismiss (Doc. 9, 21).

(2)     City Defendants' Motion to Dismiss (Doc. 9) is granted; Plaintiff's claims against City Defendants are dismissed without prejudice for failure to state a claim.

(3)     County Defendants' Motion to Dismiss (Doc. 21) is **granted in part**, and Plaintiff's § 1983 claims against County Defendants in Count III are **dismissed** without prejudice for failure to state a claim; the Motion is otherwise **denied**.

(4)     Plaintiff's state law negligence and gross negligence claims against Defendant Sheridan in his official capacity in Count II are **dismissed** without prejudice based on Plaintiff's Notice of Voluntary Dismissal (Doc. 19).

(5)     The sole **remaining** claims in this action are Plaintiff's negligence and gross negligence claims against Defendant Maricopa County in Count II.

(6)     Within **15 days** of this Order, Plaintiff must **show cause** why this action should not be remanded to state court for lack of supplemental jurisdiction.

Dated this 19th day of August, 2025.

Honorable Steven P. Logan
United States District Judge